IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br>   378 N. Main Ave.<br>   Tucson, AZ 85702,<br><br>       *Plaintiff*,<br><br>   v.<br><br>DOUG BURGUM, Secretary of the U.S. Department of the Interior<br>   1849 C Street, NW<br>   Washington, DC 20240,<br><br>BRIAN NESVIK, Director of the U.S. Fish and Wildlife Service<br>   1849 C Street, NW<br>   Washington, DC 20240,<br><br>U.S. FISH AND WILDLIFE SERVICE<br>   1849 C Street NW<br>   Washington, DC 20240,<br><br>       *Defendants*. | Case No. 1:25-cv-03596 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

    1.    The Center for Biological Diversity (Center) challenges the failure of the U.S. Fish and Wildlife Service (Service) to comply with its nondiscretionary obligations set forth in the Endangered Species Act, 16 U.S.C. §§ 1531–1544 (ESA). Specifically, the Service has failed to designate "critical habitat" for the endangered black-capped petrel (*Pterodroma hasitata*). *Id.* §§ 1533(a)(3), (b)(6)(A)(ii), (b)(6)(C). The Service's failure to designate critical habitat violates its mandatory duty under the ESA, *see id.*, and deprives this imperiled species of vitally

1

important protections in its most essential habitat areas. Indeed, listed species that are assigned critical habitat are more than twice as likely to progress towards recovery than those without it.



*Photo: U.S. Fish and Wildlife Service*

2.  The black-capped petrel is a medium-sized pelagic seabird with slender wings and distinctive markings, including a black cap and dark mantle separated by a white collar. The birds breed and nest in the high elevations of the Caribbean, returning to the same nesting areas each year. Nesting habitat in these areas is increasingly scarce.

3.  The birds nest on the ground, utilizing existing cavities under rocks or vegetation. Females lay just a single egg each breeding season, with both the female and male alternating incubation duties for roughly 50 days. After hatching, both parents share the responsibility of caring for the chick for a minimum of 80 days.

4.  Outside of the breeding season, the black-capped petrel spends most of its time at sea foraging, primarily at night. The birds feed across the western Atlantic Ocean, Caribbean Sea, and northern Gulf of Mexico.

5.  The petrel faces significant threats, including habitat loss, disorientation due to artificial lighting, oil spills, fatal collisions with offshore structures, and exposure to produced

2

water (a byproduct of oil and natural gas extraction that includes numerous hazardous chemicals).

6. Climate change—including increased storm intensity and frequency—further exacerbates these threats, making the designation of critical habitat essential for the survival and recovery of the species.

7. In light of these significant threats and following the Center's 2015 lawsuit to protect the black-capped petrel under the ESA, the Service proposed listing the species as "threatened" in 2018. On May 2, 2023, the Service reopened the comment period on the 2018 proposed rule, prompted by significant new information. This new information revealed that the threats to the species were more severe and imminent than previously described in the Service's 2018 proposal. The Service listed the black-capped petrel as "endangered" on December 28, 2023.

8. The ESA typically requires the Service to publish a critical habitat designation concurrently with listing. However, if a critical habitat designation is not determinable at the time a final listing rule is published, the Service may take one additional year to designate critical habitat. 16 U.S.C. § 1533(b)(6)(C)(ii).

9. Despite acknowledging the petrel's dire situation and the need for habitat protections, the Service did not designate critical habitat concurrently with listing the species. Instead, the Service invoked the one-year extension of its obligation to publish a critical habitat designation. However, nearly two years have passed since the Service listed the petrel and the Service has still not protected the black-capped petrel's critical habitat.

10. Because the Service is in violation of the ESA by failing to timely designate critical habitat for the black-capped petrel, judicial intervention is necessary. The Center requests

declaratory relief and an order requiring the Service to issue a rule designating critical habitat to safeguard the habitat this species needs to survive and recover.

## JURISDICTION AND VENUE

11. The Center brings this action under the ESA, 16 U.S.C. §§ 1533, 1540(g).

12. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1346 (United States as a defendant), 16 U.S.C. § 1540(c) (actions arising under the ESA), and 16 U.S.C. § 1540(g) (citizen suit provision of the ESA).

13. The relief sought is authorized under 28 U.S.C. § 2201 (declaratory relief), 28 U.S.C. § 2202 (injunctive relief), and 16 U.S.C. § 1540(g) (citizen suits under the ESA).

14. The Center provided formal notice to the Service of its intent to file suit under the ESA on July 28, 2025—more than 60 days prior to filing this Complaint. *See* 16 U.S.C. § 1540(g)(2). Because the Service has not remedied the legal violations outlined in the notice, an actual, justiciable controversy exists between the parties within the meaning of the Declaratory Judgment Act. 28 U.S.C. § 2201.

15. Venue is proper in the U.S. District Court for the District of Columbia according to 28 U.S.C. § 1391(e) because Defendants reside in and are headquartered in this district and a substantial part of the events giving rise to the Center's claims occurred in this district.

## PARTIES

16. Plaintiff Center for Biological Diversity is a national, nonprofit conservation organization incorporated in California and headquartered in Tucson, Arizona, with offices throughout the United States, including Washington, D.C. The Center works through science, law, and policy to secure a future for all species, great and small, hovering on the brink of extinction. The Center has more than 93,000 active members across the country. The Center and

4

its members are concerned with the conservation of imperiled species, including the black-capped petrel, through effective implementation of the ESA. The Center brings this action on behalf of itself and its members.

17. The Center has members with concrete interests in the conservation of the black-capped petrel and the protection of its critical habitat. The Center's members have researched, studied, observed, and sought protection for this species. In addition, the Center's members have visited and observed, or sought out, the black-capped petrel in the Caribbean and waters off the Southeastern United States. The Center's members derive recreational, scientific, professional, aesthetic, spiritual, and ethical interests in the black-capped petrel and its habitat. For example, one of the Center's members, Brett Hartl, is a lifelong wildlife enthusiast and amateur naturalist who derives immense aesthetic, recreational, and spiritual value from observing birds in their natural habitats. He has personally observed more than 4,350 bird species around the world and hopes to eventually see at least one representative species from each of the approximately 230 bird families. He has a particular interest in observing rare and imperiled bird species—including the black-capped petrel—and intends to continue seeking out the petrel in the future.

18. Mr. Hartl has repeatedly sought out the black-capped petrel and, having observed the petrel in the wild, intends to look for them in the future. For example, Mr. Hartl observed the black-capped petrel off the coast of North Carolina in 2009 and 2013 and intends to look for the petrel off the coast of North Carolina in May of 2026. The continued decline of the black-capped petrel and the destruction of its habitat directly harms Mr. Hartl's aesthetic, recreational, and spiritual interests.

19. The Service's failure to comply with the ESA's nondiscretionary deadline to designate critical habitat for the black-capped petrel denies the species vital protections that are

necessary for survival and recovery. For example, while the Service withholds critical habitat designations, human activities such as commercial fishing and oil and gas exploration and development continue to impact the black-capped petrel's habitat. Critical habitat is necessary to ensure that federally permitted activities do not result in the adverse modification or destruction of the black-capped petrel's essential habitat areas.

20. The Center's members are injured by the Service's failure to timely designate critical habitat, which delays significant protections for the black-capped petrel; facilitates the degradation and destruction of their habitat in locations where Center members go to observe and enjoy this species; and harms the black-capped petrel's survival and recovery. Until the Service protects the black-capped petrel's critical habitat under the ESA, the Center and its members' interests in the species are injured. These are actual, concrete injuries presently suffered by the Center and its members; are directly caused by the Service's inaction; and will continue to occur unless this Court grants relief.

21. The relief sought herein—an order compelling the Service to designate critical habitat for the species at issue—would redress the Center's injuries by protecting the black-capped petrel's habitat before it can be further degraded or destroyed, thereby helping to conserve the black-capped petrel so the Center and its members can continue to pursue their educational, scientific, recreational, aesthetic, and spiritual interests in the bird and its habitats. The Center and its members have no other adequate remedy at law.

22. Defendant Doug Burgum is the Secretary of the U.S. Department of the Interior. As Secretary of the Interior, Secretary Burgum is ultimately charged with ensuring that the Service (which is housed within the Department of the Interior) adheres to all applicable laws

and regulations—including the ESA and its accompanying regulations. The Center sues Defendant Burgum in his official capacity.

23. Defendant Brian Nesvik is the Director of the Service. As Director, Defendant Nesvik is the federal official responsible for ensuring that the Service complies with all applicable laws and regulations, including the ESA. The Center sues Defendant Nesvik in his official capacity.

24. Defendant U.S. Fish and Wildlife Service is a federal agency within the Department of the Interior. Through delegation of authority from the Secretary of the Interior, the Service administers and implements the ESA and is legally responsible for complying with its mandatory deadlines when making decisions and promulgating regulations, including designating critical habitat for listed seabirds.

## STATUTORY AND REGULATORY FRAMEWORK

### The Endangered Species Act: Species and Habitat Protections

25. The ESA "represent[s] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). "Congress intended endangered species to be afforded the highest of priorities." *Id.* at 174. Accordingly, the Act's purpose is to "provide a program for the conservation of . . . endangered species and threatened species" and "to provide a means whereby the ecosystems upon which endangered . . . and threatened species depend may be conserved." 16 U.S.C. § 1531(b).

26. To that end, the ESA requires the Service to protect imperiled species by listing them as "endangered" or "threatened." *Id.* § 1533(a)(1). A species is endangered if it "is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species

is threatened if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

27. Once a species is listed, it receives a host of important protections designed to prevent its extinction and aid its recovery, including one of the most crucial protections—safeguards for its "critical habitat." *Id.* § 1533(a)(3)(A).

28. Critical habitat includes specific areas occupied by the threatened or endangered species with "physical or biological features . . . essential to the conservation of the species and . . . which may require special management considerations or protection," as well as specific areas unoccupied by the species that "are essential for the conservation of the species." *Id.* § 1532(5)(A)(i).

29. "Conservation" of a species means "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." *Id.* § 1532(3). Accordingly, critical habitat includes areas that require proper management to ensure a listed species will not simply survive but also recover.

30. Protecting critical habitat is necessary to protect and recover many listed species, particularly those that have become endangered or threatened because of historical and ongoing habitat loss or degradation. Thus, Section 7 of the ESA requires all federal agencies to ensure their actions do not "jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification" of their remaining critical habitat. *Id.* § 1536(a)(2).

31. Critical habitat designations provide additional benefits as well, including opportunities for public education and involvement, which help make the public, state agencies,

and local governments more aware of the plight of listed species and the conservation actions needed to aid in species recovery.

32. Congress prioritized designating critical habitat to ensure species at risk of extinction receive these essential protections in a timely manner. *Id.* § 1533(a)(3), (b)(6)(A)(ii), (b)(6)(C); *see also id*. § 1531(b) (statutory directive to "provide a means whereby the ecosystems upon which endangered . . . and threatened species depend may be conserved"). The Service "shall," "to the maximum extent prudent and determinable," designate critical habitat for a species "concurrently with making a determination" that it is endangered or threatened, *id.* § 1533(a)(3)(A), (b)(6)(C), and within one year of issuing a rule proposing critical habitat. *Id*. § 1533(b)(6)(A)(ii).

33. In requiring the Service to designate critical habitat to the "maximum extent prudent and determinable," Congress emphasized that designating critical habitat was "of equal or more importance" than listing. H.R. Rep. No. 94-887, at 3 (1976). Critical habitat exceptions based on a finding of "not prudent" or "not determinable" are therefore limited exceptions to the strong congressional preference for designating critical habitat.

34. Indeed, Congress explained that "[n]ot prudent" determinations are reserved for "rare circumstances where the specification of critical habitat . . . would not be beneficial to the species." *See, e.g.*, H.R. Rep. No. 95-1625, at 17 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 9453, 9467.

35. While Congress did not define "prudent," the Service's regulations implementing the ESA lay out a non-exhaustive list of circumstances in which critical habitat designation may not be prudent, including:

9

>  (i) The species is threatened by taking or other human activity and identification of critical habitat can be expected to increase the degree of such threat to the species;
>
>  (ii) The present or threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species;
>
>  (iii) Areas within the jurisdiction of the United States provide no more than negligible conservation value, if any, for a species occurring primarily outside the jurisdiction of the United States; or
>
>  (iv) No areas meet the definition of critical habitat.

50 C.F.R. § 424.12(a)(1).

36. Similarly, the regulations identify two situations in which critical habitat is "not determinable":

>  (i) Data sufficient to perform required analyses are lacking; or
>
>  (ii) The biological needs of the species are not sufficiently well known to identify any area that meets the definition of "critical habitat."

*Id*. § 424.12(a)(2).

37. The Service must make critical habitat designations based on "the best scientific data available." 16 U.S.C. § 1533(b)(2).

38. Time has proven the wisdom of Congress' requirement that the Service designate critical habitat for listed species. Studies show that species with critical habitat are more than twice as likely to be in recovery than those without it.

39. But the ESA does not safeguard a species' critical habitat until the Service designates it. Accordingly, it is imperative that the Service meticulously follows the Act's procedures and deadlines to ensure it designates critical habitat in a timely manner.

10

## The Endangered Species Act:
## Timeframes for Listing Species and Designating Critical Habitat

40. To ensure the timely protection of species at risk of extinction, Congress set forth a detailed process whereby any person may petition the Service to list a species and designate critical habitat.

41. In response to a petition, the Service must take the following steps in accordance with statutory deadlines.

42. First, within 90 days of receipt of a listing petition, the Service must, "to the maximum extent practicable," publish an initial finding as to whether the petition, "presents substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id.* § 1533(b)(3)(A). This is known as a "90-day finding." If the Service determines in the 90-day finding that the petition does not present substantial information indicating that listing may be warranted, the petition is rejected and the process concludes.

43. If the Service determines that a petition does present substantial information indicating that listing "may be warranted," the agency must publish that finding and proceed with a scientific review of the species' status, known as a "status review." *Id.*

44. Upon completing the status review, and within 12 months of receiving the petition, the Service must publish a "12-month finding" with one of three determinations: (1) listing is "warranted;" (2) listing is "not warranted;" or (3) listing is warranted but precluded by other proposals for listing species. *Id.* § 1533(b)(3)(B).

45. If, after completing these three steps, the Service determines that listing is "warranted," the agency must publish that finding in the Federal Register along with the text of a proposed rule listing the species as endangered or threatened and take public comments. *Id.* § 1533(b)(3)(B)(ii).

11

46. The Service has one year from the date a proposed rule is published to issue a final listing rule. *Id.* § 1533(b)(6)(A)(i).

47. Section 4(a)(3)(A)(i) of the ESA states that, "to the maximum extent prudent and determinable," the Service "shall, concurrently with making a determination . . . that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat." *Id.* § §1533(a)(3)(A).

48. When a critical habitat designation is prudent but not determinable at the time a final listing rule is published, the Service may take one additional year to designate critical habitat. *Id.* § 1533(b)(6)(C)(ii).

49. The Act requires publication of a finalized critical habitat rule no later than this one-year extension, "based on such data as may be available at that time." *Id.*; 50 C.F.R. § 424.17(b)(2).

## THE FEDERAL GOVERNMENT'S LACKADAISICAL RESPONSE TO THE PETREL'S PLIGHT

50. The black-capped petrel is a pelagic seabird endemic to the Caribbean, and it plays a key ecological role in both marine and terrestrial ecosystems. Though it nests only in high-altitude forests of Hispaniola, it forages across the western Atlantic and southern Caribbean basins, and the northern Gulf of Mexico. The species' entire known nesting population occurs at fewer than four sites, making it highly vulnerable to localized disturbances.

51. The black-capped petrel helps indicate the health of oceanic ecosystems due to its reliance on upwelling zones and diverse foraging strategies. Petrels are known to feed in mixed flocks with other seabirds, consuming squid, fish, and crustaceans, many of which are linked to deeper oceanic currents and Sargassum mats. Their marine range includes key U.S. waters off the east Atlantic coast and Gulf of Mexico.

52. The petrel's viability is tied to highly specific conditions: steep montane forests with loose soils and sparse vegetation for nesting, and deep oceanic waters with strong upwelling for foraging. Habitat degradation—including from deforestation, shipping and offshore energy activities, and anthropogenic lighting—disrupts this delicate balance and has already led to population declines. Recent radar surveys show a 51 percent decrease in detections near Hispaniola from 2015 to 2020, with similar trends near Dominica.

53. The species is under intense pressure from synergistic threats. On land, deforestation (up to 90 percent in Haiti) and predation by invasive mammals such as dogs and mongooses have decimated nest sites. At sea, oil and gas development, marine pollution, and climate change—including more frequent and intense hurricanes—further threaten the petrel's continued existence. Overall, petrel populations show low resilience, redundancy, and representation, making them extremely vulnerable to extinction.

54. On September 1, 2011, WildEarth Guardians petitioned the Service to list the black-capped petrel.

55. On June 21, 2012, the Service published a 90-day finding determining that listing was warranted.

56. In 2015, following years of inaction by the Service, the Center filed a lawsuit against the Service for failing to list the species.

57. On October 9, 2018, the Service issued a proposed rule to list the black-capped petrel as "threatened." 83 Fed. Reg. 50,560 (Oct. 9, 2018). However, the Service claimed that designating critical habitat may not be prudent because the petrel nests outside of U.S. jurisdiction and "there are no habitat-based threats to the species in the foraging range." *Id*. at 50,572–73.

58.     The comment period for the October 2018 proposed rule ended on December 10, 2018, but the agency never finalized the proposed rule.

59.     On May 2, 2023, the Service reopened the comment period on the October 2018 proposed rule. 88 Fed. Reg. 27,427, 27,427 (May 2, 2023). In doing so, the Service noted that "[s]ince the 2018 proposed rule, we have received new or updated information regarding the black-capped petrel's life history, range, habitat, and factors influencing the species' viability. The information indicates the magnitude of threats is likely greater than we had previously assessed." *Id*.

60.     On December 28, 2023, the Service issued a final rule listing the black-capped petrel as an endangered species under the ESA. 88 Fed. Reg. 89,611 (Dec. 28, 2023). In so doing, the Service determined that the petrel warranted endangered—rather than threatened—status because the species is currently in danger of extinction throughout its range. *Id*. at 89,623.

61.     In the December 2023 rule, the Service determined that designating habitat for the black-capped petrel was prudent but "not determinable." *Id*. at 89,625. The Service changed its position regarding prudency due to the emergence of new information evidencing "threats acting on the species within areas under U.S. jurisdiction." *Id*. Specifically, the Service highlighted habitat threats posed by offshore energy development, such as collisions with infrastructure; disorientation from lighting and flaring; and exposure to toxic petroleum products and other discharged wastewater products. *Id*. at 89,621–20.

62.     In the same rule, the Service noted that the ESA allows it "an additional year to publish a critical habitat designation that is not determinable at the time of listing." *Id.* at 89,625 (citing 16 U.S.C. 1533(b)(6)(C)(ii)).

14

63. The one-year extension allowed for the designation of critical habitat has come and gone, expiring on December 28, 2024.

64. The Service's ongoing failure to designate critical habitat for the black-capped petrel deprives this endangered species of protections to which it is legally entitled and leaves it at increased risk of injury and death in its most important habitat areas.

## CLAIM FOR RELIEF

### Failure to Designate Critical Habitat for the Black-Capped Petrel

65. The Center re-alleges and incorporates by reference all the allegations set forth in this Complaint as though fully set forth below.

66. The ESA required the Service to designate critical habitat for the black-capped petrel concurrently with listing, or within the one-year extension from the date of listing. 16 U.S.C. § 1533(b)(6)(C)(ii). However, the Service never designated critical habitat for this species. The Service is therefore in violation of the ESA's express statutory command to timely designate critical habitat.

67. The Service's failure to designate critical habitat for the listed black-capped petrel violates the ESA, *id*. § 1533(a)(3)(A), (b)(6)(A), (b)(6)(C), and its implementing regulations. 50 C.F.R. § 424.17(b)(2).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Center for Biological Diversity requests that this Court enter a Judgment in favor of the Center providing the following relief:

(1) Declare that Defendants are violating the Endangered Species Act by failing to designate critical habitat for the black-capped petrel (*Pterodroma hasitata*);

(2)   Order Defendants to designate—by a reasonable date certain—critical habitat for the black-capped petrel under the Endangered Species Act, 16 U.S.C. § 1533(a)(3)(A), (b)(6)(A), (b)(6)(C);

(3)   Grant the Center its reasonable attorneys' fees and costs in this action, as provided by the Endangered Species Act, 16 U.S.C. § 1540(g)(4); and

(4)   Provide such other relief as the Court deems just and proper.

DATED: October 7, 2025                         Respectfully submitted,

 /s/ *Mark D. Patronella*
Mark Patronella, DC Bar No. 1657204
CENTER FOR BIOLOGICAL DIVERSITY
1411 K St. NW, Suite 1300
Washington, DC 20005
(771) 474-1018
mpatronella@biologicaldiversity.org

Catherine W. Kilduff, DC Bar No. 1026160
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
(510) 844-7109
ckilduff@biologicaldiversity.org

*Attorneys for Plaintiff*